IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| M.S., by and through his next friend, ANGELIQUE S., | § § § | |
| *Plaintiff,* | § § | CIVIL ACTION NO. 1:24-CV-00026 |
| VS. | § § | JUDGE MICHAEL J. TRUNCALE |
| BEAUMONT INDEPENDENT SCHOOL DISTRICT, | § § § | |
| *Defendant.* | § | |

**ORDER GRANTING DEFENDANT BEAUMONT INDEPENDENT SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF M.S.'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Before the Court is Defendant Beaumont Independent School District ("BISD")'s Motion for Summary Judgment. [Dkt. 8]. BISD filed its motion in this Court on September 13, 2024. *Id.* On the same day, Plaintiff M.S. ("MS"), by and through his next friend, Angelique S.,[1] filed a Motion for Judgment on the Administrative Record. [Dkt. 9]. BISD and Angelique S. submitted Responses to each other's motions on October 4, 2024. *See* [Dkts. 10, 11]. The Court held oral argument on December 9, 2024. As the Minute Entry reflects, the Parties did not supplement the Administrative Record ("AR") by presenting evidence at this hearing. The pending motions are now ripe for review.

For the reasons stated below, the Court **GRANTS** BISD's motion for summary judgment and **DENIES** Angelique S.'s cross-motion.

## I.   BACKGROUND

This is an appeal of a Special Education Hearing Officer ("Hearing Officer")'s decision which affirmed BISD's proposal to place MS in its Academics for Life ("AFL") program—a placement that would remove him from the general education setting. This appeal arises under the Individuals with Disabilities in Education Act ("IDEA").

---

[1] Going forward, the Court will reference Angelique S. when describing MS's motion, his Response, and the arguments raised therein.

### a.  IDEA: An Overview

The IDEA, 20 U.S.C. § 1400 *et seq.*, "offers States federal funds to assist in educating children with disabilities." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017). The Act was passed to ensure that disabled children are neither excluded from public education nor left to fend for themselves in inappropriate environments. *See Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1038 (5th Cir. 1989). The "cornerstone" of the IDEA is the statutorily mandated "free appropriate public education," or "FAPE." *Id.* at 1043; *see also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 209 (1982).

While the FAPE is the cornerstone of the IDEA, the individualized education plan ("IEP") is "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988). An IEP is a comprehensive plan that, among other things, sets out "measurable annual goals, including academic and functional goals." *Endrew F.*, 580 U.S. at 391 (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(III)). In short, "[t]he IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Id.* (quoting *Rowley*, 458 U.S. at 181).

An IEP is developed at annual admission, review, and dismissal committee ("ARDC") meetings. *See* § 1414(d)(1)(B). The ARDC generally consists of the child's parents, the child (if appropriate), relevant teachers, and district employees. *See generally id.* The ARDC discusses "the child's present levels of academic achievement and functional performance" and sets future goals for the child, which the parents have the chance to approve. *E.R. ex rel. E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 758 (5th Cir. 2018) (per curiam) (citing § 1414(d)(1)(A)(i)).

To meet the IDEA's substantive requirements, "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 403. This does not mean that an IEP must aim for "grade-level advancement." *Id.* at 402. Rather, a child's IEP "must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Id.*

Critically, the IDEA's text reflects Congress' "strong preference in favor of mainstreaming," which consequently affects the parameters for developing IEPs. *Daniel R.R.*, 874 F. 2d at 1044. Mainstreaming refers to "[e]ducating a handicapped child in a regular education classroom with nonhandicapped children[.]" *Id.* at 1039. Pursuant to § 1412(5)(A)'s "least restrictive environment" clause, a school district must ensure that its handicapped students are educated with nonhandicapped students to the "maximum extent appropriate." *See* 20 U.S.C. § 1412(a)(5)(A). This preference is only overcome "when education in a regular classroom cannot meet the handicapped child's unique needs." *Daniel R.R.*, 874 F.2d at 1045.

Having sketched the big ideas for the IDEA, the Court will proceed into the facts of this case.

**b. First Grade (2021-2022)**

When this case was before the Hearing Officer, MS was an eight-year-old[2] third-grader at Homer Drive Elementary School ("Homer Drive"). AR at 6. He enjoys plushies, games, and going to McDonald's with his family. *Id.* MS lives with his mother, grandmother ("Debbie S."), aunt, and cousin. *Id.* MS is known for his cheery demeanor and gets along well with adults and his peers. *Id.* at 557.

MS began school at Homer Drive during the 2017-2018 school year; he was enrolled in its preschool program for children with disabilities. *Id.* The background events in this matter kicked off in March of 2021,[3] while MS was in Kindergarten. *Id.* at 10.

---

[2] MS is now ten years old. *See* AR 30.

[3] Before this point, MS had received the following evaluations: (1) a full and individual evaluation ("FIE") from BISD in 2017, (2) a private psychological evaluation in March of 2019, (3) a Review of Existing Evaluation Data ("REED") from BISD in January of 2020, and (4) an "mClass" reading screener administered by BISD in January of 2021. *See* AR at 7–8, 1336–41.

Based on the FIE, BISD concluded that MS was eligible for special education and related services under the categories of Autism, Speech Impairment, and Intellectual Disability. *Id.* at 6–7. The private evaluator found that MS qualified for special education under the Speech Impairment and Intellectual Disability categories, but not the Autism category. *Id.* In response, BISD removed the Autism category for MS. *Id.* at 7–8. But it ultimately re-added the category based on the findings from the REED. *Id.*

The "mClass" test showed that MS's reading performance was "well below the expected level." *Id.* at 1336, 1337–41.

On March 25, 2021, BISD held an ARDC meeting to review MS's IEP. *Id.* This was the first of 11 ARDC meetings. Angelique S. attended the meeting on March 25.[4] *Id.*

MS's IEP contained two math goals, one English language arts and reading ("ELAR") goal, a speech therapy goal, and an occupational therapy goal, all of which were tailored to his present level of academic achievement and functional performance ("PLAAFP"). *Id.* at 10, 389–392. MS's IEP contained nine accommodations that were based on his prior evaluations, *see supra*, note 3, and would apply across all subjects (ELAR, math, science, and social studies): "Consider effort/participation as part of grade," "Teacher check for understanding and reteach/reread materials as indicated," "Visual aids (pictures, flash cards, etc.)," "Chunk assignments," "Limit multiple choice answers to three at a time," "Test: Small-Group Administration," "Present new vocabulary visually," "Provide student with alphabet strip and number line attached to desk," and "Reminders to stay on task." *Id.* at 393.

Under his IEP, MS would be pulled into the special education classroom for ELAR (one time per week for 30 minutes), speech therapy (at the same frequency), and occupational therapy services (for eight, 30-minute sessions across nine weeks). *Id.* at 10, 398. MS would also receive in-class supports (i.e., his listed accommodations) from his general education teacher for reading and math. *Id.* at 398. This ARDC meeting ended in agreement. *Id.* at 10, 402.

MS started first grade at Homer Drive in the fall of 2021. *Id.* at 10. On November 2, 2021, BISD held another ARDC meeting to review MS's IEP. *Id.* at 10. The ARDC retained MS's previous accommodations and services, but it added one accommodation to address an accident he had at school.[5] *Id.* at 421, 426. This ARDC meeting ended in agreement. *Id.* at 429.

After the November ARDC meeting, MS underwent three more evaluations. First, BISD conducted an Occupational Therapy Evaluation on November 15, 2021. *Id.* at 8, 229. The evaluator noted that one of

---

[4] Angelique S. was present at all ARDC meetings. Before each meeting, the ARDC sent her a "Notice of Procedural Safeguards" and she acknowledged receipt. *See, e.g.*, AR at 401. The ARDC also sent Angelique S. all IEP documentation after each meeting. *Id.*

[5] The ARDC described the new accommodation as follows: "In the event that [MS] has a bowel movement accident at school, the school nurse will provide him with a change of clothes and wipes to clean himself." *See* AR at 421.

MS's greatest struggles was "attending to tasks." *Id.* at 8, 233. An outside evaluator then conducted a psychological evaluation on November 30, 2021. *Id.* at 8, 234. The outside evaluator noted that MS exhibited echolalia (a repetition of words a child just heard at an inappropriate time for repetition), he would scream or laugh without reason, and he showed unusual interest in sensory aspects of the environment. *Id.* at 10, 241–42. Finally, BISD conducted a REED and reevaluation in December of 2021 ("December 2021 REED"), which indicated MS had a General Intellectual Ability standard score of 60—this showed significantly below-average cognitive functioning compared to his peers. *Id.* at 275.[6] *Id.* at 10, 244. Based on the December 2021 REED, BISD concluded that MS still qualified for special education under the Autism and Speech Impairment categories. *Id.* at 10, 283–84.

That brings us to the third ARDC meeting on March 10, 2022 ("March 2022 ARDC Meeting"). *Id.* at 10. This is the starting point in Angelique S.'s timeline of events. *See* [Dkt. 9 at 4].

The ARDC, after revisiting the December 2021 REED and its addendum, added Intellectual Disability as an eligibility category for MS. AR at 11, 435, 451. The ARDC agreed that MS was progressing towards his IEP goals. *Id.* at 451. However, MS showed a decreasing ability to work independently; he required many prompts to initiate and complete his work, even in the special education classroom. *Id.* at 436. The ARDC increased MS's special education instruction time in ELAR and math to 150 minutes per week; it also continued his speech and occupational therapy services and added transportation services (allowing MS to ride on the special education bus for field trips). *Id.* at 449.

MS's March 2022 IEP included 17 accommodations across all subjects, most of which were holdovers from his previous IEP. *Id.* at 11, 444. The following were notable additions: "Grade on mastery of skill rather than participation," "Adaptive paper," "Extra time for oral response," "*Modified curriculum*," "Test: Oral Administration: read entire test," "Provide verbal cues and verbal prompts," "Encouragement to

---

[6] An addendum to the December 2021 REED was completed on February 3, 2022. AR at 244–87. The addendum noted that MS scored in the third percentile in his overall level of adaptive functioning, the second percentile in communication and daily living skills, and the fourth percentile in socialization. *Id.*

try different foods," and "Frequent structured movement breaks."[7] *Id.* at 444 (emphasis added). This ARDC meeting ended in agreement. *Id.* at 454.

By the end of the 2021-2022 school year, although M.S. made progress on his IEP goals, he continued to struggle in the general education setting. *Id.* at 653–61.

### c. Second Grade (2022-2023)

#### i. September 2022 ARDC Sessions

At the beginning of MS's 2nd-grade year, BISD administered an mClass assessment. *Id.* at 1365–67. MS continued to perform well below grade-level expectations. *Id.* at 1084–86. To illustrate, M.S. scored zero on basic reading comprehension, nonsense word fluency, rapid automized naming, and spelling. *Id.* at 1061–83. His oral reading fluency was measured as one word correct per minute. *Id.* at 1074.

BISD convened an ARDC meeting on August 30, 2022; this meeting ultimately stretched across several sessions held on September 9, September 22, and September 27 (collectively, "September 2022 ARDC Sessions"). *Id.* at 476–507. The last two September sessions included a TEA-assigned IEP facilitator (Margaret Christen). *Id.* at 497–98.

Over the September 2022 ARDC Sessions, MS's IEP was updated to reflect that, "although [MS] is in the 2nd grade, he performs academically at a kindergarten level in reading and math based on benchmarking data." *Id.* at 477. The ARDC noted that MS could identify single-letter sight words, but struggled with reading accuracy, fluency, basic comprehension, recalling story elements, and reading simple sentences. *Id.* at 478.

MS's Special Education teacher, Lilah Malveaux ("Malveaux"), explained that MS struggled to retain prerequisite skills that are essential for his success in the general education classroom. *Id.* at 1088, 19:43–20:28. As a result, much of the instructional time was spent on revisiting and reinforcing these foundational skills to help him meet classroom expectations. *Id.*

---

[7] MS could use bouncy bands, fidget devices, and other objects during these breaks. *See* AR at 452.

The ARDC updated MS's IEP goals, *id.* at 481–83, and increased his special education instruction time for ELAR (up to 60 minutes per day) and Math (up to 45 minutes per day). *Id.* at 492. MS continued to receive speech and occupational therapy services in the special education classroom and accommodations in the general education setting. *Id.* at 492–93. MS also was set to have a close-proximity escort to the special education bus in addition to his transportation services for field trips. *Id.* at 493, 498.

The ARDC modified MS's accommodations in several meaningful ways. *Id.* at 487. There were new limitations. Per occupational therapist instruction, MS's "adaptive paper" accommodation was limited to situations "when the focus is on spelling and handwriting or visual cues[.]" *Id.* In other words, the "adaptive paper" accommodation would no longer cover reading, math, science, or social studies. *Id.* Additionally, MS was to be given "no more than five" "verbal cues and verbal prompts" on assignments. *Id.*

There were some additions. MS would be given "[e]ncouragement to verbalize steps needed to complete assignment/task,"[8] "one day" of "[e]xtra time for completing assignments[,]" and reductions in assignment length up to 50% (at the teacher's discretion). *Id.*

There were also some subtractions. MS's IEP no longer included accommodations for bowel movements and encouragement to try different foods. *Id.* And important to this litigation, the new IEP removed "modified curriculum."[9] *Id.* The deliberation notes state that "[t]he accommodations reviewed were agreed upon." *Id.* at 496. It also stated that the ARDC sought to remove the bowel movement accommodation "[b]ased on updated guidance from the district."[10] *Id.* Although the "modified curriculum" accommodation

---

[8] This replaced the previous accommodation of "Grade on mastery of skill rather than participation" in the March 2022 IEP. *See* AR at 444.

[9] Further up, the IEP documentation states the following: "Although [MS] benefits socially from being in mainstream classes, his class work in reading and math *needs to be modified*." AR at 477 (emphasis added).

[10] Although the bowel movement accommodation was not formally listed alongside the other accommodations in the September 2022 IEP, *see* AR at 487, an agreement was apparently reached on the issue:

> The following statement was agreed upon by the ARDC: In the event that Malachi has a bowel movement at school, designated campus staff who are familiar with Malachi will provide him with an opportunity to change his clothes and wipes to clean himself in a private restroom. Designated staff will ensure through verbal prompts that Malachi is properly dressed and ready to return to class. The preferred, but not required, staff designee will be the nurse and the preferred restroom location is the nurse's office.

*See id.* at 497.

was not addressed by name, the deliberation notes mentioned that "[a]t this time, *the Amplify curriculum* is currently being utilized at Homer Elementary." *Id.* (emphasis added).

Although Angelique S. voiced several concerns during the September 2022 ARD Sessions, she ultimately approved MS's new IEP. *Id.* at 1088, 32:30–34:55 (Angelique S. expressing concern over the bowel movement accommodation), 1:24:17–1:25:05 (Angelique S. expressing concern over the level of supervision for MS when he moved between the cafeteria and the bus); *see also* AR at 493, 497–99.

After the September 2022 ARD Sessions, MS's IEP Progress Reports showed that he was making progress towards his IEP goals, but he had struggle areas and required heavy prompting. AR at 662–67, 668–82. Around this time, BISD administered the middle of the year mClass assessment for reading skills. *Id.* at 1368–69. MS performed well below grade-level expectations, including scoring zero on many of the assessment categories. *Id.* at 1365.

### ii.   February 2023 ARDC Meeting

BISD convened another ARDC meeting on February 6, 2023. *Id.* at 518–44. This meeting had been rescheduled to ensure Angelique S.'s participation. *Id.* at 540. Three minutes before the meeting, Angelique S. sent the ARDC an email expressing concerns about MS's IEP; the ARDC acknowledged receipt and indicated that they would address the concerns in a subsequent meeting. *Id.* at 540, 552–53 (Angelique S. expressing concern over, *inter alia*, MS's reading skills and the full implementation of his IEP).

The ARDC discussed MS's continued challenges in both reading and math. *Id.* at 519–23. MS struggled to keep up in the general education class and showed significant skill deficits. *Id.* at 541. Historically, on benchmarking for grades K, 1st, and the beginning of 2nd grade, MS consistently performed well below grade level. *Id.* at 520, 1370.

Angelique S. requested that the ARDC "table" the meeting, but the committee declined since all topics had already been covered. *Id.* at 541. For this reason, this meeting ended in disagreement. *Id.* This was the first ARDC meeting without a happy ending. *Id.* MS's assortment of therapy services, special education services, and general education supports were essentially unchanged from the September 2022 ARD Sessions. *Compare id.* at 531, 536–37, *with id.* at 487, 492–93.

### iii.  March 2023 ARDC Sessions

On March 3rd,[11] March 23rd, and April 13th, 2023, BISD convened ARDC meetings to perform the annual review of MS's IEP. *Id.* at 583–87. The ARDC noted that MS's instructional reading level was pre-primer, meaning that his learning material was presented to him at the Pre-Kindergarten or Kindergarten level. *Id.* at 555. Similarly, in Math, MS was assessed to be in the "urgent intervention" target with instruction in number operations, algebraic reasoning, geometry, and measurement at the Kindergarten level. *Id.* MS displayed multiple grade-level deficits despite the increases in his special education services and accommodations. *Id.* at 555–58.

Based on MS's demonstrated need, the ARDC proposed placing MS in AFL[12] for all core subjects. *Id.* at 579–80. AFL is a specialized placement designed for students with significant intellectual and/or self-help disabilities who require support in developing functional academic and life skills (such as functional reading and math, money management, self-advocacy, and independence). *Id.* at 1445. Instruction is based on prerequisite skills from the Texas Essential Knowledge and Skills ("TEKS") and focuses on practical application. *Id.* AFL uses the Unique Learning System, an alternative curriculum aligned with TEKS. *Id.* Students are also included in campus and grade-level activities and participate in electives when possible. *Id.*

The AFL placement was first mentioned during the March 23 ARDC meeting[13]: the ARDC and Angelique S. did not see eye to eye. *Id.* at 584–86. Debbie S. expressed that the family's disagreement was based, in part, on the fact that BISD "ha[d] not done everything that is humanly possible" prior to making the proposal. *Id.* at 1088, 2:34:48–2:35:04. BISD explained that its placement proposal was not based on MS's Intellectual Disability, but instead, was based on his specific educational needs. *Id.* at 2:46:48–2:47:17. In light of the disagreement on the AFL placement, BISD provided a 10-day recess. *Id.* at 586. BISD gave

---

[11] The March 3 meeting was tabled due to Angelique S.'s health. AR at 584. The Court will unpack the details later in this Order.

[12] AFL was previously called the "Life Skills classroom."

[13] Near the beginning of this meeting, Angelique S. read a statement stating that she is not able to process information after 2 hours due to a documented disability. AR at 584. Later, she asked to table the meeting on this basis. *Id.* at 585. Angelique S. did not provide documentation about this disability before the meeting and claimed that she didn't have to. *Id.* at 585. The ARDC continued the meeting despite Angelique S.'s request. *Id.*

Angelique S. a chance to visit an AFL class during recess. *Id.* Additionally, outside the meeting, Angelique S. had requested an independent educational evaluation (IEE); her request was granted and, as of the March 23 ARDC meeting, she was in the process of securing an evaluator. *Id.* A tentative reconvene date was set for April 6, but the ARDC did not gather again until April 13. *Id.*

At the reconvened meeting, the ARDC reviewed its reasons for proposing the AFL placement. *Id.* at 586–87. The meeting ended in disagreement. *Id.* BISD prepared to implement MS's IEP with AFL as they had deemed appropriate. *Id.* at 589–90.

The following individuals attended the April 13 reconvene, in addition to Angelique S. and Debbie S.: Dr. Charisma Popillion (District Representative), Rachel Bandy (MS's General Education teacher), Ms. Malveaux (MS's Special Education teacher), Catherine Freeman[14] (Speech Pathologist), Ericia Redmon (Low-Incidence Disabilities Specialist), Phyllis Thibodeaux (Assessment & Evaluation Specialist), Judith Flagle (Occupational Therapist), Bonnie Hybner (Special Education Advocate), Richelle Brooks (Senior Director of Special Programs), and Laurie Kolp (Educational Diagnostician). *Id.* at 586, 588. The committee composition for the March 3 and March 23 meetings were largely the same.[15]

### iv. Due Process Hearing & Hearing Officer's Decision (April-September 2023)

On April 19, 2023, Angelique S. requested an impartial due process hearing under the IDEA. *Id.* at 1. She alleged that BISD failed to provide MS with a "FAPE" by offering an IEP that was not designed to help him progress in reading. She further claimed that BISD did not properly implement MS's IEP, proposed a placement that was not the Least Restrictive Environment ("LRE") for MS, and failed to collaborate effectively with her in planning his education by withholding important data and information about his progress. *Id.* at 2.

---

[14] Ms. Freeman did not provide her signature. AR at 588.

[15] The March 3 meeting had the following unique attendees: Monique Woolridge (a family friend), and Kaitlin McMahan (a "speech pathologist/AT evaluator"). AR at 583. Ms. McMahan apparently appeared on the behalf of Angelique S. since Anglique S. excused her from the meeting at 11:26 AM. *Id.* at 584. Ms. Brooks attended the March 23 and April 13 meetings, but not the March 3 meeting. *Id.* at 583–86.

As relief, Angelique S. requested that the Hearing Officer (i) order BISD to educate MS in a general education classroom with appropriate supports and services, (ii) provide compensatory education services, and (iii) fund a private reading specialist to work with MS. She also requested that the Hearing Officer to grant any other appropriate relief. *Id.* at 3. BISD denied Angelique S.'s allegations, asked the Hearing Officer to deny all requested relief, and asserted a statute of limitations[16] defense. *Id.* at 2–3.

The due process hearing occurred on September 13–14, 2023, via Zoom. *Id.* at 3. The Hearing Officer heard testimony from five witnesses: Ms. Bandy, Ms. Malveaux, Dr. Popillion, Ms. Brooks, and Ms. Redmon. *Id.* at 1495, 1774. The Hearing Officer admitted 53 joint exhibits, 12 exhibits from Angelique S., and 41 exhibits from BISD. *Id.* at 3, 205–08, 720, 1089–92.

On November 6, 2023, the Hearing Officer ruled in BISD's favor. *Id.* at 25–26. The Hearing Officer concluded that (1) "[BISD] provided [MS] a FAPE during the relevant time period, and his IEP was reasonably calculated to address his needs in light of his unique circumstances," (2) "[BISD] educated [MS] in his LRE both before and after recommending [MS] attend school in the AFL classroom," and (3) "[Angelique S.] and other key stakeholders participated appropriately in planning [MS's] IEP." *Id.* Although the Hearing Officer's decision goes into finer detail, he noted that the testimony and evidence was lopsided in favor of the AFL placement:

> *Each witness* testified that Student needs to be placed in the AFL classroom for his academic subjects. *No one* testified that Student should remain in his current setting. *No reports or evaluations* offered into evidence indicated Student's current setting was appropriate for him or that his education program was not appropriate for his needs.

*Id.* at 4 (emphasis added). Including the Hearing Officer's decision, the Administrative Record in this matter is just short of 2,000 pages.

Angelique S. appealed the Hearing Officer's decision under 20 U.S.C. § 1415(i)[17] and seeks a reversal. [Dkt. 1 at ¶ 1]. Angelique S.'s appeal has two moving parts. First, she spotlights the March 2022

---

[16] BISD apparently abandoned this argument since it was never mentioned in the Hearing Officer's decision. *See* AR at 1–26.

[17] "Any party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and any party aggrieved by the findings and decision made under this subsection, *shall have the right to bring a civil action . . . in any State court of competent jurisdiction or in a district court of the United States*, without

ARDC Meeting and the September 2022 ARDC Sessions, lasering in on a specific accommodation in MS's IEP. *Id.* at ¶¶ 7–8. MS's March 2022 IEP included "modified curriculum" as an accommodation; this was removed in his September 2022 IEP. *Id.* According to Angelique S., this unilateral decision, made without consideration of MS's unique needs, explained MS's performance issues and showed that AFL was not, in fact, a LRE for him. *Id.* at ¶ 13.

Second, Angelique S. argues that BISD failed to collaborate with her. From October 17, 2022, Angelique S. and her advocate (Ms. Hybner) expressed concerns about MS receiving grades based on an unmodified curriculum when the March 2022 IEP stated he needed a modified one. *Id.* at ¶ 11. Their concerns "did not lead to any change in BISD's approach." *Id.* Angelique S. also argues that the ARDC mocked and dismissed her during the March 23 meeting after she explained her inability to process information after two hours. *Id.* at ¶ 14.

Since this appeal has been pending, MS has remained in the general education setting based on 20 U.S.C. § 1415(j).[18]

## II.   LEGAL STANDARDS

### a.   Substantive IDEA Challenge

The reviewing court's inquiry here is whether: (1) the State has complied with the procedural requirements of the IDEA; and (2) "the individualized educational program developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits[.]" *See Rowley*, 458 U.S. at 206–07. "If these requirements are met, the State has complied with the obligations imposed by

---

regard to the amount in controversy." *See* 20 U.S.C. § 1415(i)(2)(A) (emphasis added). "The party bringing the action *shall have 90 days* from the date of the decision of the hearing officer to bring such an action[.]" *Id.* § 1415(i)(2)(B) (emphasis added).

[18] "Except as provided in subsection (k)(4), *during the pendency of any proceedings conducted pursuant to this section*, unless the State or local educational agency and the parents otherwise agree, *the child shall remain in the then-current educational placement of the child . . . .*" *See* 20 U.S.C. § 1415(j) (emphasis added).

In the Complaint, Angelique S. alleges that "BISD has threatened to remove Plaintiff from the General Education classroom despite having been advised of the pendency of this appeal and despite the fact that it is enjoined from changing Plaintiff's placement during the pendency of this litigation[.]" [Dkt. 1 at ¶ 24]. Angelique S. has not informed the Court (either at oral argument or by other appropriate notice) that BISD has in fact followed through on this alleged threat. *See id.* Accordingly, the Court presumes that MS is not currently in AFL.

Congress and the courts can require no more." *Id.* at 207. Since Angelique S. brings no procedural challenges, the Court focuses on the substantive facet.

In this circuit, courts look to four factors when reviewing "whether an IEP is reasonably calculated to provide a meaningful education benefit under the IDEA," namely, whether: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Barry F.*, 118 F.3d 245, 253 (5th Cir. 1997); *see also E.R.*, 909 F.3d at 765 ("Our court's four *Michael F.* factors and the Supreme Court's holding in *Endrew F.* do not conflict."). While the Fifth Circuit has "never specified precisely how these factors must be weighed," *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 293 (5th Cir. 2009), it has "long held that the fourth factor is critical." *Renee J. ex rel. C.J. v. Hous. Indep. Sch. Dist.*, 913 F.3d 523, 529 (5th Cir. 2019) (citation omitted).

The second *Michael F.* factor addresses mainstreaming and is guided by the two-part test set out in *Daniel R.R. See R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1013 (5th Cir. 2010). Under that test, courts must first ask "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child." *Daniel R.R.*, 874 F.2d at 1048 (citing § 1412(5)(B)). If the answer is no, and the school "intends to provide special education or to remove the child from regular education," we then ask "whether the school has mainstreamed the child to the maximum extent appropriate." *Id.* (citing § 1412(5)(B)). A variety of factors inform us at each stage of this inquiry, though the factors are by no means exhaustive, nor a single factor dispositive. *Id.* Rather, each case calls for an "individualized, fact-specific inquiry." *Id.*

### b. Standard of Review

Under the IDEA, a district court reviews a hearing officer's decision "virtually de novo." *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 967 (5th Cir. 2016) (citation omitted); *but see id.* at 961 (noting that a district court must accord due weight to a hearing officer's findings). A district court's

decision "is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, *together with any additional evidence*,[19] establishes that there has been compliance with [the] IDEA's processes and that the child's educational needs have been appropriately addressed." *Id.* at 967 (emphasis added) (citation omitted). A "preponderance of the evidence" standard applies. *See* 20 U.S.C. § 1415(i)(2)(C). Because the IDEA "creates a presumption in favor of a school system's educational plan," the burden of proof rests on the party challenging that plan. *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003).

"[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *See Rowley*, 458 U.S. at 206. "The primary responsibility for formulating . . . the educational method most suitable to the child's needs[ ] was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child." *Id.* at 207; *Daniel R.R.*, 874 F.2d at 1048. "[C]ourts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Rowley*, 458 U.S. at 208 (quoting *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 42 (1973)).

## III.    DISCUSSION

The Court finds that all the *Michael F.* factors have been satisfied in this case. It will address each of them in turn, giving special attention to the second.

### a. Individualization

MS's IEP was individualized. The IDEA contains several individualized considerations for school districts when developing an IEP. *See, e.g., R. S. by & through Ruth B. v. Highland Park Indep. Sch. Dist.*, 951 F.3d 319, 330 (5th Cir. 2020). The ARDC should consider "(i) the strengths of the child; (ii) the concerns of the parents for enhancing the education of their child; (iii) the results of the initial evaluation or most recent

---

[19] A guidance document from the Texas Education Agency ("TEA") in BISD's Response brief is the only evidence outside the record in this case. *See* [Dkt. 10 at 4].

evaluation of the child; and (iv) the academic, developmental, and functional needs of the child." 20 U.S.C. § 1414(d)(3)(A).

BISD satisfied these requirements. There were 11[20] ARDC meetings in total, each attended by key stakeholders. MS underwent several evaluations and assessments and the ARDC used these findings to calibrate his IEP. For example, based on the concerning data from the December 2021 REED and its addendum, the ARDC increased MS's special education instruction time in ELAR and math to 150 minutes per week at the March 2022 ARDC Meeting. *See* AR at 449. The ARDC also added new accommodations at this meeting (such as adaptive paper and oral administration of tests) to enhance MS's learning experience in both the general education and the special education setting. *Id.* at 444. This is one of many examples in which the ARDC engineered MS's IEP to cater to his evolving needs. *See also H.W. by & through Jennie W v. Comal Indep. Sch. Dist.*, 32 F.4th 454, 465 (5th Cir. 2022) (concluding that "H.W.'s IEP was undoubtedly individualized" because "[t]he ARDC showed that it was vigilant in its evaluation, observation, and assessment of H.W. and that it routinely updated H.W.'s IEP to reflect its individualized findings."); *see also A.A. v. Northside Indep. Sch. Dist.*, 951 F.3d 678, 691 (5th Cir. 2020) (holding similarly).

Angelique S. thinks otherwise. She argues that Ms. Malveaux "expressly avoided using the specific devices that [MS] was most drawn to, such as 'Huggie Wuggie, Tales, [and] [Alvin and the] Chipmunks[.]'" [Dkt. 9 at 13]. Angelique S. contrasts this with Ms. Bandy, who would use these devices to facilitate MS's learning. *Id.*

Although Angelique S. raised this argument in her closing brief, the Hearing Officer did not address it head on. *See* AR at 19–20, 136. Regardless, the Court will conduct its own review, as it must. *See Seth B.*, 810 F.3d at 967.

Angelique S. is mostly right on the facts but wrong on the conclusion. The February 6, 2023 ARDC meeting reflects that MS is drawn to several characters:

> [MS] is fixated on characters on TV, he mimics what he watches and listens to on TV, tablet, etc. He exhibits multiple off tasks [sic] behaviors such as his obsession with Huggy Wuggie,

---

[20] This number excludes amendments to MS's IEP that were made *without* an ARDC meeting. *See, e.g.*, AR at 382, 467.

Tales, Chipmunks, the list goes on and on. He imagines talking to them and having a conversation with them during lessons.

AR at 519. Although Ms. Malveaux drafted this sentence, *id.* at 1626, the Court will begin with Ms. Bandy's testimony on the topic of characters.

Ms. Bandy did not think Huggy Wuggy was an appropriate learning device but used a variety of alternative characters. At the hearing, she testified that "Huggy Wuggy is a graphic adult cartoon." *Id.* at 1565. "He has, like, these big, giant, gruesome teeth and he smiles really big." *Id.* "The story is, is that he was left in a toy factory. And he encourages people to kill the adults that are coming, because if they find him, they will kill him." *Id.* Ms. Bandy learned about Huggy Wuggy after observing MS's interest in the character and doing independent research. *Id.* Given her discovery, Ms. Bandy testified that "we would go towards other characters that he was more fixated on than Huggy Wuggy." *Id.* at 1566. Those characters included "Tales," "Sonic," "Mario," and "[Alvin and the] Chipmunks." *Id.* Ms. Bandy also testified that, aside from characters, she wove "things that [MS] enjoyed" into instruction, such as McDonald's. *Id.* Ms. Bandy admitted that though characters could get MS's attention, if she "moved on to something else, sometimes he wouldn't move on with me. He would just want to talk about what he was fixated on." *Id.* at 1567.

Ms. Malveaux took a different approach. She did not use Huggy Wuggy since he was an "evil character" and was "[in]appropriate for school-age children." *Id.* at 1627. She also did not incorporate "Tales" into instruction. *Id.* However, contrary to Angelique S.'s position in her brief, Ms. Malveaux occasionally wove in "[the] Chipmunks." *Id.* When asked why she did not incorporate "Tales," Ms. Malveaux testified that MS's fixation on the character would distract him from his work. *Id.*

Ms. Malveaux's approach to using characters of interest does not prove that MS's IEP was not individualized. For one, specific characters of interest were never built into MS's IEP. *See, e.g., id.* at 531 (noting "visual aids" as an accommodation, including "pictures" as a visual aid, but failing to specify further). Additionally, this argument asks too much—it is laden with discretionary judgments best reserved to teachers. *See Rowley*, 458 U.S. at 208. Ms. Malveaux chose to use characters of interest sparingly because of

their tendency to distract MS from his work. Even Ms. Bandy, who took a more permissive approach, acknowledged that the characters could result in fixation, hampering MS's ability to transition to other tasks. The Court cannot conclude that MS's IEP was not individualized simply because—in an area that it left open—Ms. Bandy took a slightly more permissive approach than Ms. Malveaux.

Angelique S. also argues that the removal of the "modified curriculum" accommodation during the September ARDC Sessions proves MS's IEP was not individualized. She emphasizes that "this critical change in course was not based on any evaluation or assessment of [MS], but entirely on BISD's own global decision not to modify the curriculum for anyone outside a special education classroom[.]" [Dkt. 9 at 14–15]. Since this argument naturally bleeds into the LRE inquiry, the Court will address it in the following section.

### b. Least Restrictive Environment

The Court must now determine whether the proposed AFL placement is MS's LRE. *See* 20 U.S.C. § 1412(a)(5)(A).[21] As stated above, we must first ask if MS could be satisfactorily educated in the regular classroom with supplemental aids and services.[22] *Daniel R.R.*, 874 F.2d at 1048. If the answer is no, then we must ask whether BISD mainstreamed MS "to the maximum extent appropriate." *Id.* The *Daniel R.R.* test is a "flexible approach to deciding whether a school has complied with the mainstreaming requirement." *Brillon v. Klein Indep. Sch. Dist.*, 100 F. App'x 309, 312 (5th Cir. 2004) (per curiam).

Based on this two-pronged inquiry, the Court concludes that AFL is the LRE for MS.

---

[21] The IDEA requires that

> *To the maximum extent appropriate*, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs *only when the nature or severity of the disability* of a child *is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily*.

20 U.S.C. § 1412(a)(5)(A) (emphasis added).

[22] The Hearing Officer's decision mentioned this step without breaking it down into its subsidiary parts. *See* AR at 20–22. The Court does this below.

### i.    Whether Education in the Regular Classroom, with Supplemental Aids and Services, Could be Satisfactorily Achieved

The first step in the LRE analysis is more complicated than the second. When deciding "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child[,]" courts consider several non-exhaustive factors. *Daniel R.R.*, 874 F.2d at 1048. Those factors include (1) "whether the state has taken steps to accommodate the handicapped child in regular education"[23]; (2) "whether the child will receive an educational benefit from regular education"; (3) "the child's overall educational experience in the mainstreamed environment, balancing the benefits of regular and special education for each individual child"; and (4) "what effect the handicapped child's presence has on the regular classroom environment and, thus, on the education that the other students are receiving." *Id.* at 1048–49. The Court addresses each of these in turn.

### 1.    BISD Took Steps to Accommodate MS

"The [IDEA] does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad." *Daniel R.R.*, 874 F.2d at 1048 (citations omitted).

Here, BISD made far more than "mere token gestures." *Id.* The record reflects that BISD made genuine attempts to accommodate MS in the general education setting.

For each of MS's assignments in the general education setting, Ms. Bandy used an accommodation sheet with up-to-date accommodations under MS's IEP and checked off which accommodations she applied for the assignment. *See* AR at 1528, 1530, 1585. These accommodation sheets were approved by Ms. Redmon, who worked in the Special Education Department. *Id.* at 1531. The accomodation sheets had checkboxes for particular subjects (ELA, math, science, and social studies) and a notes section for Ms. Bandy to provide more details. *See, e.g.*, *id.* at 1114, 1130–01, 1139. For example, on one sheet for what appears to

---

[23] Although Angelique S. either expressly or impliedly addressed the remaining factors, it appears that she didn't address this one. *See generally* [Dkts. 9, 11].

be an ELAR assignment, Ms. Bandy noted that she verbalized the steps for the assignment, "chunked" it for MS, shortened it, provided five prompts, gave frequent breaks, and provided extended time. *Id.* at 1281. Ms. Bandy noted that she reviewed the spelling words before the test, but that MS had a hard time staying focused. *Id.*

There is other testimony showing that BISD accommodated MS in the general education classroom. Ms. Bandy testified that she even went above and beyond MS's IEP at times; for example, she wrote down answers that MS would dictate to her when the assignment wasn't graded on writing. *Id.* at 1585 ("There was a lot of extra things that I did for him."). Further, during his second-grade year, Ms. Bandy spent "about 60 percent of [her] day" with MS in the general education setting. *Id.* at 1583. This evidence clears the "token gesture" bar with room to spare. *See Daniel R.R.*, 874 F.2d at 1048.

### 2. MS did not Receive Meaningful Academic and Non-academic Benefits in General Education

The next two factors to consider are: (1) whether MS was receiving an educational benefit from BISD's efforts; and (2) MS's overall experience in general education when "balancing the benefits of regular and special education for him." *Daniel R.R.*, 874 F.2d at 1048–49. The first inquiry "necessarily will focus on the student's ability to grasp the essential elements of the regular education curriculum." *Id.* at 1049. The court "must pay close attention to the nature and severity of the child's handicap as well as to the curriculum and goals of the regular education class." *Id.* The court must assess MS's "overall academic record" to see if he was "making appropriate progress [in the general education setting] in light of [his] circumstances."[24] *H.W.*, 32 F.4th at 469.

Here, MS was not receiving a meaningful academic benefit in general education. Although BISD gradually increased MS's special education services and accommodations over time, he struggled mightily in the general education setting. At the time of the AFL recommendation in April of 2023, MS was functioning at the "pre-K or K level." AR at 555. Based on benchmark data, he was at the "urgent intervention

---

[24] Of course, this progress is measured at the individual level; the Court does not measure MS's abilities "in relation to the rest of the class." *See Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 586 (5th Cir. 2009). So, for instance, a lasered focus on percentile scores is probably inappropriate. *See id.* at 589 (citing *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000)).

target level" in both reading and math. *Id.* MS was "able to identify less than five two and three letter sight words" and could solve simple addition and subtraction problems up to 20 with manipulatives. *Id.* at 555–56.

Ms. Bandy's testimony provides insight into MS's daily experience in general education. She testified that she would accommodate MS by chunking assignments, reducing their length, and removing answer choices. *Id.* at 1584. Then, she would walk around the class to answer questions from other students. *Id.* "Normally, within my time of leaving [MS] and coming back to him, he was still on the same number that I left him on. He wouldn't move on. Normally he would sit there, maybe play with something in his desk, maybe take him a little bit of a break[.]" *Id.* In other words, without Ms. Bandy present, MS struggled to stay on task and progress on assignments.

Ms. Redmon, BISD's Low-Incidence Disabilities Specialist, also testified that MS was accessing the grade-level curriculum at the prerequisite level and lacked the foundation to participate. *Id.* at 1910–11. Combined with Ms. Bandy's testimony, this is compelling evidence that MS could not "grasp the essential elements of the regular education curriculum." *Daniel R.R.*, 874 F.2d at 1049; *see also id.* at 1050 ("Daniel's handicap has slowed his development so that he is not yet ready to learn the developmental skills offered in Pre-kindergarten.").

When "balancing the benefits of regular and special education for [MS]," *id.* at 1048–49, there is one non-academic benefit to general education that is undeniable: interaction with his typically developed peers. *See also id.* at 1049 ("Integrating a handicapped child into a nonhandicapped environment may be beneficial in and of itself."). MS's April 2023 IEP even notes "[l]ack of an opportunity for social interaction" as a "[p]otential harmful [e]ffect[]" of removing MS from the general education setting. *See* AR at 577. But mainstreaming cannot hinge on this fact in light of MS's academic struggles. *See Daniel R.R.*, 874 F.2d at 1051 ("[T]he only value of regular education for Daniel is the interaction which he has with nonhandicapped students . . . we cannot agree that the opportunity for Daniel to interact with nonhandicapped students is a sufficient ground for mainstreaming him.").

Angelique S. argues that MS would have received academic benefits in the general education classroom if BISD had modified his curriculum appropriately. *See* [Dkt. 9 at 17]. Clearly this is the heartbeat of the appeal. *See generally* [Dkts. 1, 9]. The Court will give this argument the attention it deserves. But before doing so, it will note a semantic point that is actually far more than just semantics (quite the rare breed indeed).

Angelique S.'s argument takes the form of a third conditional[25]: "if MS's curriculum *was* properly modified, he *would have obtained* academic benefits in the general education setting." *See also* [Dkt. 9 at 21 (stating that if MS's curriculum as properly modified, Ms. Bandy would not have had to spend so much time with him in the general education class)]. Although Angelique S. does some "negative" work in the briefing (arguing why BISD's efforts *did not* amount to a curriculum modification), she never provides affirmative evidence of what a modified curriculum would've looked like or how it would've altered MS's performance in the general education setting. None of the testifying witnesses at the due process hearing did this lifting either—the only affirmative evidence in the record points to AFL.

Placing this preliminary concern aside, the Court will address the "modified curriculum" argument in full.

### a.  "Modified Curriculum"

The Court concludes that MS's curriculum was "modified" for all intents and purposes. As stated above, MS's March 2022 IEP contained 17 accommodations, including a "[m]odified curriculum" across every subject. *See* AR at 444. This accommodation was also reflected in an amendment to the March 2022 IEP executed on July 27, 2022. *Id.* at 471, 475. However, the ARDC removed "modified curriculum" from MS's accommodations list during the September 2022 ARDC Sessions. *Id.* at 487. Angelique S. believes that this foils the *Michael F.* factors, especially the LRE factor. *See* [Dkt. 9 at 11–26].

---

[25] *Conditionals:* if, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/grammar/british-grammar/conditionals-if (last visited, Apr. 15, 2025) (emphasis and italicization in original) ("We use the third conditional when we imagine a different past, where something did or did not happen, and we imagine a different result: *If I **had played** better, I **would have won**.*").

This argument is complex and requires some splicing. The Court will begin with the curriculum used in the general education classroom. Then, the Court will discuss whether this curriculum was "modified" for MS.

### i. The Amplify Curriculum

For the relevant period, BISD uses the Amplify Curriculum[26] at its Homer Drive campus. *See* AR at 478, 496, 1523–24, 1554–55, 1576. The testimony in the record indicates that the Amplify Curriculum could not be "modified." Ms. Bandy testified that, though she could provide accommodations on particular assignments, she could not modify the Amplify Curriculum and had to teach it "with fidelity." *Id.* at 1551– 52. In other words, Ms. Bandy perceived a difference between accommodations and curriculum modification.[27] *See id.*

This point was re-iterated by Dr. Popillion (the principal at Homer Drive) and Ms. Malveaux. *Id.* at 1620–01, 1728. In fact, Dr. Popillion testified that the general education curriculum could not be changed at any BISD campus, not just Homer Drive. *Id.* at 1728. This is the reason why BISD removed the "modified curriculum" accommodation from MS's September 2022 IEP.[28] *See id.* at 496 ("At this time, the Amplify curriculum is currently being utilized at Homer Elementary.").[29]

---

[26] Homer Elementary used the Houghton Mifflin Harcourt curriculum during the 2021-2022 school year. *See* AR at 1728. It shifted to the Amplify curriculum for the 2022-2023 school year. *Id.*

[27] BISD cites guidance from the TEA that captures this difference. *See* [Dkt. 10 at 4]. The Court will take judicial notice of this guidance. *See* FED. R. EVID. 201(b), (c)(1); *see also Jenny Yoo Collection, Inc. v. Watters Designs, Inc.*, No. 3:17-CV-3197-M, 2018 WL 3330025, at *5 n.8 (N.D. Tex. June 6, 2018) (Lynn, C.J.) (citing *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (per curiam)) ("Courts may take judicial notice of information found on agency websites.").

The TEA Guidance states that "[a]ccommodations are intended to reduce or even eliminate the effects of [a] student's disability on academic tasks but *do not change learning expectations*." *See* TEX. EDUC. AGENCY, TECHNICAL ASSISTANCE: INDIVIDUALIZED EDUCATION PROGRAM (IEP) DEVELOPMENT (2023) (emphasis added). In other words, they merely "change how the student learns or demonstrates knowledge." *Id.*

On the other hand, "[m]odifications change what the student is expected to master." *Id.* "Modifications typically require a student to learn less material or learn material below grade level and/or complete or be tested over easier or less complex problems." *Id.*

[28] Although Ms. Bandy, Ms. Malveaux, and Dr. Popillion attended the September 2022 ARDC Sessions, none of them attended the March 2022 ARDC Meeting. *See* AR at 454.

[29] Granted, Angelique S. raises an interesting point. Although Ms. Brooks attended the March 2022 ARDC Meeting, where the "modified curriculum" accommodation made its debut, she did not object to the accommodation. *See* AR at 1787–88. However, this is largely irrelevant for the reasons stated below.

### ii.  The Meaning of "Modification"

The next question is whether BISD effectively "modified" the Amplify curriculum for MS. The Hearing Officer concluded it did. *See* AR at 21 ("The witnesses also testified that [MS] is working on a curriculum different from the curricula his peers are working on. His goals and class work are significantly below grade level."), 22 (emphasis added) ("While Petitioner claims the District was unwilling to modify [MS's] curriculum, the evidence demonstrates Student *was working almost entirely on a modified curriculum* with goals significantly below grade level.").

This boils down to that all-too-familiar battle of the ages: functionalism versus formalism. The Court starts with the formalist position held by Angelique S.

Angelique S. argues that (1) the "modified curriculum" accommodation was clearly removed in the September 2022 ARDC Sessions, and (2) nothing BISD did post-removal amounted to a "modification" of MS's curriculum. On the second point, Angelique S. explains that MS took the same tests and completed the same assignments as his typically developed peers (i.e., he was learning and being tested on the Amplify Curriculum). *See id.* at 1522–05, 1525–28, 1534–38, 1609–12. As such, it was obvious why MS was falling behind—he was not being presented with "materials at his own level." *See* [Dkt. 9 at 18 n.9].

Ms. Brooks's testimony is the lifeblood of BISD's functionalist position. *See* [Dkt. 10 at 4]. Ms. Brooks holds a Bachelor of Science in Elementary Education ('86), a Masters of Education in Educational Psychology ('91), and a Supervisory Certificate Special Education from the University of Houston ('96). *See* AR at 1451. She started working in Special Education Services for BISD in August of 2021. *Id.*; *see also id.* at 1830–31 (acknowledging that Ms. Brooks's resume erroneously stated that she worked for Houston ISD for the period starting in August of 2021). Before she testified, she observed MS, conversed with his support team and family, and listened to prior testimony from Ms. Bandy, Ms. Malveaux, and Dr. Popillion. *Id.* at 1802–03.

Ms. Brooks testified that the host of accommodations Ms. Bandy and Ms. Malveaux provided[30] are indistinguishable from an actual "modification" of MS's curriculum; as such, Angelique S. misses the forest for the trees:

> Q. Okay. As you listened to this testimony, what was your reaction to that testimony? Did you -- did you agree with them that the modified curriculum accommodations should have been taken out? Or what was your reaction?
>
> A. My reaction was that *there's a misunderstanding about what modification meant* to the curriculum; and that although the words "modified curriculum" were removed, *the actual act* of what we were doing did not change. That's -- that is my opinion. Whether you call it "modified curriculum" or not, if you're making the same things and you can list the changes for that particular student, if it's a modification, it's a modification.
>
> Q. Okay. And so if I'm understanding you correctly, it really doesn't make any difference in terms of [MS's] actual education and the services and instruction provided to him whether the words "modified curriculum" appear on this page or not, *because the district was doing the same thing as if those words had appeared in this -- on this page, correct*?
>
> A. I – that's what – that's what I'm thinking, yes.

*Id.* at 1806–07 (emphasis added). Ms. Brooks referenced Ms. Bandy's acts of "limiting the number of choices[,]" "showing [MS] pictures[,]" and "changing the way that she presented information" as examples of effective modifications to MS's curriculum. *Id.* at 1810. She continued:

> Q. And you testified about that earlier in response to my questions when you said that *when you sort of bundle a whole host of accommodations together, sometimes the net effect of that might be to have some impact on what the student is actually learning in terms of the curriculum*. Did I understand that correctly?
>
> A. Correct.

*Id.* at 1855–56 (emphasis added); *see also id.* at 1811 ("So -- it depends. And I'm saying that because if you use one or two [accommodations], you're not [lowering the instructional level]. But when you start using every one of them, it could be lowering the instruction level."); *see also id.* at 1859 ("[B]ecause it could be, based on all of the accommodations, a different assignment, if that makes sense."); *see also id.* at 1925, 1939 (Ms. Redmon[31] providing an expert opinion in harmony with Ms. Brooks's).

---

[30] Ms. Brooks refers to these services as "specially designed instruction." *See* AR at 1807.

[31] As stated above, Ms. Redmon is the Low Incidence Disability Specialist for BISD. AR at 1865. She has served in this role for two years and primarily works with BISD's AFL and structured learning programs. *Id.* at 1866. Ms. Redmon received a

The Hearing Officer was persuaded by Ms. Brook's and Ms. Redmon's unrebutted expert testimony. *See id.* at 21, 22. The Court is equally persuaded. *See Daniel R.R.*, 874 F.2d at 1050 (rejecting an argument that "we can never know whether Daniel could have been educated in a regular classroom" since it was not supported by the record, which showed the school district modified the pre-K program and provided supplementary services); *see also Renee J.*, 913 F.3d at 530 (rejecting a "formalistic" argument similar to Angelique S.'s). To reverse the Hearing Officer's finding, the Court would have to do the brunt work of a special education expert that Angelique S. never called. *See Rowley*, 458 U.S. at 207.

Angelique S. disagrees with Ms. Brook's testimony. First, she argues that "there is no evidence, whether from any ARD[C] meeting or otherwise, that any BISD staff member ever suggested outside of the due process hearing that there was any confusion as to what the term 'modified curriculum' meant." [Dkt. 9 at 12 n.8]. As such, the "'confusion' is clearly nothing but a contrivance for the purposes of the litigation." *Id.*

This argument was ventilated at the due process hearing. Angelique S.'s counsel raised this issue during his direct examination of Ms. Brooks. Counsel used the email from Ms. Hybner on October 17, 2022 (expressing concern about MS being graded on an unmodified curriculum) to pin down the timing of the curriculum modification "confusion." *See* AR at 1818. Ms. Brooks testified that she dealt with a lot of emails and could not recall whether she or Ms. Redmon responded to Ms. Hybner's email. *Id.* at 1819. Ms. Brooks testified further that she "hope[d]" someone responded to Ms. Hybner's email, but she could not recall whether someone did. *Id.* at 1819–20. The Hearing Officer observed this testimony and Ms. Brooks's demeanor, but did not flag a credibility issue in his decision. *See generally id.* at 1–26. Absent other direct evidence of manufactured "confusion," the Court, sitting one step removed from the due process hearing, will not override the Hearing Officer's implicit credibility determination. *See Seth B.*, 810 F.3d at 967.

As briefly discussed above, Angelique S. makes several technical arguments discussing the lack of a true "curriculum modification." She argues that the March 2022 accommodations list proves, in and of itself,

---

Bachelor of Arts in Behavioral Analysis from Lamar University and has obtained a special education certification for K through 12. *Id.* at 1869.

that "curriculum modification" is not interchangeable with a cluster of accommodations as Ms. Brooks suggests: if that was the case, why was "curriculum modification" listed *separately* alongside the other accommodations? *See* AR at 444. MS took the same Amplify Curriculum tests and assignments as his typically developed peers. Further, none of MS's accommodations "have anything whatsoever to do with the content of the curriculum." *See* [Dkt. 9 at 25]. "Taking frequent breaks or extended time, for example, does not change whether a student is trying to master calculus or basic arithmetic." *Id.*

The lack of supporting expert testimony dooms these arguments. Under his September 2022 IEP, MS had 15 accommodations in both the general education and special education settings: encouragement to verbalize steps, visual aids, adaptive paper for English Language Arts, assignment chunking, extra time for completion, extra time for oral responses, limited multiple choice answers, discretionary reductions in assignment length (up to 50%), oral administration of tests, small group administration of tests, visual presentation of new vocab, an alphabet strip and number line, up to five verbal prompts, structured movement breaks, and reminders to stay on task. *See* AR at 487. Angelique S. argues that no permutation of these accommodations amounts to a curriculum modification—something more is needed.[32]

But there's an important guardrail here—BISD is not obligated to modify the Amplify curriculum "beyond recognition." *See Daniel R.R.*, 874 F.2d at 1050 (noting that Daniel's instructor "would have to alter 90 to 100 percent of the curriculum to tailor it to [his] abilities" and that such an act of "modify[ing] the curriculum beyond recognition" is "not require[d] in the name of mainstreaming"). This puts Angelique S. on a Homeric journey between the Scylla and the Charybdis.[33] On one side lies the Scylla: BISD's argument,

---

[32] Angelique S. provides an example in her motion for summary judgment. She references a math assignment administered by Ms. Malveaux where she adjusted it so that MS would not have to make calculations totaling greater than 20. *See* AR 858, 1655–59, 1807–08. But Angelique S. claims that *even this* is not a true "curriculum modification" since "the required mathematical operations remain the same, even if the results do not." *See* [Dkt. 9 at 7 n.3].

BISD argues that Angelique S. is essentially asking for "an undefined increase in supports." [Dkt. 10 at 6].

[33] The Court sees no need to duplicate the explanatory work of another esteemed jurist:

> The phrase refers to two extremely perilous (mythical) hazards that Odysseus, on his way home from the Trojan War, encountered when he had to navigate the narrow Strait of Messina (separating what are now known as the island of Sicily and the so-called "toe" of the Italian peninsula). The Strait was sandwiched between the Scylla and Charybdis. The Scylla was a six-headed monster who, from a cliff on one side of the Strait, reached out into the Strait and snatched up and devoured sailors. And the Charybdis was a

supported by Ms. Brook's and Ms. Redmon's expert testimony, that it *essentially* "modified" MS's curriculum through clusters of accommodations.[34] And on the other side lies the Charybdis: *Daniel R.R.*'s command that mainstreaming does not require "modify[ing] a curriculum beyond recognition." In a desperate effort to dodge the Scylla, Angelique S. is unfortunately swallowed up by the Charybdis. Only an expert could have navigated these treacherous waters.[35]

Although Angelique S. had no expert of her own, she did say something about them:

As discussed in Plaintiff's Motion, at Section II.C, the Hearing Officer believed that Plaintiff had not made his case because he did not call specific witnesses that testified to the appropriateness of the general education classroom. *However, to require Plaintiff to produce* what would ultimately be *expert witnesses* to testify about the appropriateness of the general education classroom *would in effect allow school districts to take any measures they choose to alter a disabled student's program for its own convenience, despite its inevitable impact on the student's academic and non-academic trajectories, as long as the parent lacks the resources to present expert testimony* regarding the suitability of the general education placement under the original program which the school district itself had previously proposed. Such a regime is untenable and would greatly enhance the ability of school districts to serve their own administrative interests, instead of those of the child.

[Dkt. 11 at 6 (emphasis added)].

The Court respects this zealous advocacy, but is ultimately unpersuaded for three reasons. For starters, it chafes against the burden of proof, which lies solely with Angelique S. *See White*, 343 F.3d at 377. This standard of proof is indifferent to the resource constraints that plaintiffs face. Arguably, this isn't what

---

whirlpool that sank ships that sailed too close on the other side of the Strait, trying to avoid the Scylla. Odysseus knew he was darned if he sailed closer to the Scylla and darned if he didn't and instead passed through the Strait closer to the Charybdis . . . .

*McKathan v. United States*, 969 F.3d 1213, 1216 n.1 (11th Cir. 2020).

[34] This appears consistent with the TEA Guidance. *See supra*, note 24. "Modifications typically require a student *to learn less material* or learn material below grade level and/or complete or be tested over *easier or less complex problems*." *See* TEX. EDUC. AGENCY, TECHNICAL ASSISTANCE: INDIVIDUALIZED EDUCATION PROGRAM (IEP) DEVELOPMENT (2023) (emphasis added). Based on this language, MS's teachers "modified" MS's curriculum when they, for example, reduced the length of his assignments and/or eliminated answer choices for him.

[35] To her credit, Angelique S. acknowledges the problem posed by *Daniel R.R.*:

Although the Fifth Circuit in *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989), held that a school district was not required to modify the curriculum "beyond recognition," it unequivocally called for school districts to modify the curriculum *short of such drastic changes*, when appropriate to facilitate inclusion for the child in the least restrictive environment.

[Dkt. 11 at 5 (emphasis added)]. But this begs the question. Angelique has no evidence that her understanding of a "curriculum modification" falls short of the "drastic changes" proscribed in *Daniel R.R.*.

the law should be. But alas, this Court must dutifully apply the law as it currently stands. Second, Angelique S. arguably had witnesses at her disposal. For example, the notes from the ARDC meeting on March 23, 2023 reflect that Angelique S. had requested an IEE for "additional cognitive testing" on MS and was "in the process of finding someone[.]" *See* AR at 586. Ms. McMahan, a "Speech Pathologist/AT Evaluator," attended the ARDC meeting on March 3, 2023 on Angelique S.'s behalf, but Angelique S. excused her at 11:26 AM. *Id.* at 583–84. Ms. Hybner advocated for Angelique S. at the relevant ARDC meetings and actually sent the email that was specific to the "curriculum modification" issue. *See id.* at 496, 497, 498, 780. But for a reason that only Angelique S. or her counsel would know, none of these individuals made it to the due process hearing. Angelique S. didn't take the shot; now she must live with the result. And third, even if Angelique S. couldn't muster an expert at the due process hearing, she could have at least presented evidence in some other form at the hearing on the pending motions—she passed on this opportunity as well.

For the reasons stated above, the Court concludes that, though "modified curriculum" was removed as an accommodation in the September 2022 ARDC Sessions, the broader context of MS's IEP shows that BISD effectively "modified" his curriculum.

### 3.   MS Effected the Education of Other Students

The record reflects that MS had a negative effect on the general education environment, even though he was well-behaved.

MS is not disruptive; the record is replete with evidence that he is kind, well-mannered, and gets along well with his typically developed peers.[36] *See* AR at 241 ("He interacts with all his peers, and they accept and take care of him."), 325 ("[Plaintiff] shows strong leadership skills, takes responsibility for all of the doors, and has even redirected students to get back in line. It should be noted this is in a positive compassionate way, not threatening or bossy."), 414 ("He plays well with others and demonstrates empathy towards his classmates."), 477 ("[Plaintiff] greets peers, gets along well with others, and follows instructions and rules with supports appropriately for his age."), 479 (posing the question whether MS's "behavior

---

[36] Ms. Bandy testified that MS interacted with his peers about interests of his, but he did not interact with them about "academic subjects." *See* AR at 1590. This has no bearing on MS's disruptiveness.

impede[s] child's own learning or that of others" and answering that question in the negative), 558 (same), 1796.

However, disruptiveness is not dispositive—there's more to the inquiry. Ms. Bandy testified that she dedicated the majority of her time in the classroom to implementing MS's accommodations. *See id.* at 1583 (emphasis added) ("In my classroom, approximately about *60 percent* of my day when he was in the room with me was spent with [MS]."). Ms. Bandy testified that her instruction with MS amounted to "a class within a class"—"it really was me and him inside a classroom of me and everybody else and him." *Id.* at 1587, 1588; *see also Brillon*, 100 F. App'x at 313; *see also J.H. v. Fort Bend Indep. Sch. Dist.*, No. H-10-2994, 2011 U.S. Dist. LEXIS 172480, at *77 (S.D. Tex. Sep. 1, 2011).

Angelique S.'s attempt to dodge the "class within a class" pitfall is unavailing. First, she attributes the time spent with MS to the refusal to "modify" his curriculum. *See* [Dkt. 9 at 20–21]. The Court thoroughly addressed this argument above. MS's curriculum was "modified."

Angelique S.'s attempts to distinguish *J.H.* fall flat; the testimony in that case was based on nearly identical facts. *See J.H.*, 2011 U.S. Dist. LEXIS 172480, at *77 ("Overall, she described the inclusion of J.H. in the regular education classroom as 'a class within a class[]' because he required one-on-one attention and curriculum modification.").

A Sixth Circuit case that Angelique S. cites offers no help either. *See L.H. v. Hamilton Cnty. Dep't of Educ.*, 900 F.3d 779 (6th Cir. 2018). Wielding this case, Angelique S. argues that BISD's "class within a class" argument is an argument against mainstreaming on principle. The Court disagrees. The defendant in *L.H.* advanced a concerning argument that BISD (wisely) doesn't even come close to making:

> *HCDE's theory is that, because special-education students are so different from their classmates socially and intellectually, they are necessarily "isolated" from them even though they are physically in the same room. Thus, special-education students can never truly be "mainstreamed."* Specifically, HCDE contends that L.H. was not mainstreamed at Normal Park, asserting that L.H.'s second grade teachers at Normal Park placed him "at his own table in the back of the classroom" and treated him so differently from the general student population that he "*was essentially in a classroom of one* even though he was physically located in the gen-ed classroom." HCDE then refers to a video of L.H. at TMS to claim that, even at TMS, "L.H. [was] functionally isolated from typically developing peers despite sitting in their midst." This is common, HCDE says, because "the academic gap between students with disabilities and typical peers can be so extreme that it is isolating and stigmatizing."

> *This is really an argument against "mainstreaming" as a concept, because HCDE believes it is impossible, impractical, or counterproductive* . . . This might be merely the view of HCDE's appellate attorneys, but if it is truly HCDE's view, *then it is worrisome* and inadvertently supports L.H.'s parents' experts' opinions that HCDE teachers and staff reject mainstreaming because they do not understand it, do not believe in it, and need extensive training on why it is valuable and how to do it. These actions at Normal Park do not demonstrate a failure of mainstreaming as a concept, but a failure of L.H.'s teachers and the other HCDE staff to properly engage in the process of mainstreaming L.H. rather than isolating and removing him when the situation became challenging.

*Id.* at 794–95 (emphasis added). The distinction is bright as day. BISD never argued that students like MS "can never truly be 'mainstreamed'" because they are so inherently different from their typically developed peers. *Id.* at 794. There's a difference between opposing mainstreaming as a concept and stating that the practice has reached its limits for a particular student, despite its benefits. BISD's position lies in the second bucket.

*A.B.* is inapposite. *See A. B. by & through Jamie B. v. Clear Creek Indep. Sch. Dist.*, 787 F. App'x 217 (5th Cir. 2019) (per curiam). A.B.'s IEP had a key difference from MS's that made the "class within a class" rationale inapplicable; A.B.'s IEP included an in-class special education aide who "he primarily focused his attention on[ ] and learned from" instead of the general education teacher. *Id.* at 219. For this reason, the Fifth Circuit held that A.B. did not "create an undue burden" for the general education instructor. *Id.* at 222 (internal quotation marks omitted). Since MS's IEP did not include an in-class paraprofessional, Ms. Bandy was working without a release valve. Interestingly, Debbie S. requested this service at the ARDC meeting on March 23, 2023. *See* AR at 585. But the ARDC chose to not incorporate it into MS's IEP since it lacked supporting data and would "not foster [MS's] independence." *Id.*

For these reasons, the Court concludes that MS had a negative effect on the education of his typically developed peers, despite his lack of disruptiveness. With the first prong of the LRE inquiry handled, the Court will now progress to the second.

### ii.  Whether MS was Mainstreamed to the Maximum Extent Appropriate

The IDEA requires "schools to offer a continuum of services." *Daniel R.R.*, 874 F.2d at 1050 (citations omitted). This means that schools "must take intermediate steps where appropriate[.]" *Id.* (footnote

omitted). Because mainstreaming determinations require independent, case-by-case evaluations, "[t]he appropriate mix [of general to special education classes] will vary from child to child." *Id.* To comply with the IDEA, a student's plan must provide for exposure to nonhandicapped students to the maximum extent appropriate.

MS was mainstreamed to the maximum extent appropriate. BISD mainstreamed MS and gradually increased his special education instruction as he continued to struggle. *See* AR at 492. And even when it recommended AFL, the ARDC proposed that MS still be placed in the general education setting for Physical Education and Fine Arts. *Id.* at 579–80. This is anything but a "keep up or get out" posture that Angelique S. pins on BISD. [Dkt. 11 at 7]. For these reasons, the Court holds that AFL was the LRE for MS.

### c.  Coordination & Collaboration

BISD collaborated with Angelique S. throughout the IEP development process. School districts must allow parents to play a key role in the development of the IEP. *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 395 (5th Cir. 2012). The IDEA contemplates a collaborative process between the school district and the parents. *E.R. v. Spring Branch Indep. Sch. Dist.*, Civil Action No. 4:16-CV-0058, 2017 WL 3017282, *27 (S.D. Tex. June 15, 2017), *aff'd*, 909 F.3d 754 (5th Cir. 2018). Importantly, the IDEA does not require a school district, in collaborating with a student's parents, to accede to a parent's demands. *Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 658 (8th Cir. 1999). The right to meaningful input does not mean a student's parents have the right to dictate an outcome, because parents do not possess "veto power" over a school district's decisions. *White*, 343 F.3d at 380. Absent bad faith exclusion of a student's parents or refusal to listen to them, a school district meets the IDEA's requirements regarding collaborating with a student's parents. *Id*.

Angelique S. argues that BISD failed to collaborate with her in two ways: (1) it offered "no meaningful response" to Ms. Hybner's email about MS's modified curriculum, and (2) the ARDC mocked her inability to continue meetings after two hours "due to processing issues and health considerations." [Dkt. 9 at 26–27].

The first argument is questionable. Even if BISD truly did not respond, AR at 1819–20, the Court is unsure that such a failure is fatal given BISD's consistency throughout the multi-year IEP development process. Angelique S. is stacking too much weight on too thin of a reed.

The second argument is similarly unpersuasive. This argument requires an analysis of the video footage of the ARDC meetings on March 3 and March 23, 2023. The Court will review the relevant portions.

At the March 3 meeting, Angelique S. said she was feeling "overwhelmed" about "all the contradictions that we got going on" and requested to table the meeting. *See id.* at 717, 1:30:44–31:28.

Ms. Redmon said that the ARDC understands Angelique S.'s desire to table the meeting, but she received a draft copy of the agenda and the PLAAFS and the ARDC intended to proceed. *Id.* at 1:31:30–50. Angelique S. repeated that "I am the parent," that she didn't "feel comfortable," and that the ARDC is "lying to her." *Id.* at 1:31:52–32:00. Ms. Hybner (Angelique S.'s advocate) agreed that the meeting should be tabled since all the material was a lot for one person to process. *Id.* at 1:32:02–28. Angelique S. reiterated her desire to table the meeting because her "nerves is bad" and she doesn't appreciate all the lying about MS. *Id.* at 1:32:42–33:00. Dr. Popillion then assured Angelique S. that the ARDC would address all her parental concerns and that the ARDC is not "lying" to her. *Id.* at 1:33:25–34:27.

After some back-and-forth, Angelique S. raised her voice and said "I do not feel good. I am on medication. Can you please table this ARD?" *Id.* at 1:40:40–41:10. After Ms. Redmon stated that the meeting would adjourn for a "short break," Angelique S. raised her voice even louder and repeated that she does not feel good. *Id.* at 1:41:10–19. A break was taken at 12:00 PM. *Id.* at 1:41:24–26.

The ARDC held its position that the meeting should continue and Angelique S. started to break down—she repeated "I want to table" eight times, called a BISD board member, told him that the ARDC has been "bullying [her]" all year long," and recited the names of the ARDC members as she began to have difficulty breathing. *Id.* at 1:46:07–1:47:52. Dr. Popillion asked Angelique S. to "take a deep breath." *Id.* at 1:47:54–48:02.

Ms. Redmon eventually agreed that the meeting needed to be tabled since AS was suffering a "mental crisis." *Id.* at 1:49:27–34. Debbie S. retorted that Angelique S. is not "having a mental crisis." *Id.* at 1:49:34–

37. After a continued exchange between Debbie S. and the ARDC, Ms. Thibodeaux recommended tabling the meeting due to AS's health issues; Angelique S. could be heard dry heaving violently at this time. *Id.* at 1:55:49–56:02. Debbie S. ended up calling an ambulance to attend to Angelique S.'s panic attack. *Id.* at 1:56:03–10. The March 3 meeting was tabled at 12:20 PM. *See* AR at 584.

Near the beginning of the March 23 reconvene, Angelique S. read a statement describing her disability, which prevents her from processing large amounts of information over two hours. *See* AR 718, at 0:03:19–0:04:09. Angelique S. requested the ARDC to accommodate her under the Americans with Disabilities Act by allowing her to table the meeting after the two-hour mark. *Id.* Ms. Brooks stated that Ms. Redmon had shared "the goals" with Ms. Hybner and Angelique S. before the meeting so that Angelique S. would have additional processing time. *Id.* at 0:04:15–04:40. The meeting continued.

Around the two-hour mark, Angelique S. stated that her "anxiety was getting high" and requested to table the meeting. *Id.* at 1:54:00–11. Ms. Brooks stated that a break was possible, but the ARDC did not receive any prior notice about the two-hour limit. *Id.* at 1:54:12–24; *see also* AR at 584. Ms. Hybner pointed out that the meeting invitation said the meeting would run from 9AM to 11AM. AR 718, at 1:54:37–46. Dr. Popillion noted that the invitation said 9AM to 11AM, but that this is not the first time the meeting has gone over. *Id.* at 1:55:51–56:22. Angelique S. continued to participate in the meeting after the two-hour mark. *Id.* at 2:14:05–23.

These interactions show disagreement, not a lack of collaboration. At no point did the ARDC "mock" Angelique S.'s condition. The closest statement still misses the mark by a mile. Ms. Redmon's statement that Angelique S. was suffering a "mental crisis" was a genuine statement of concern. *See* AR 717, at 1:49:27–34. Although Debbie S. quickly retorted that Angelique S. wasn't experiencing a "mental crisis," she admitted herself that an ambulance was needed because Angelique S. was experiencing a "panic attack."

The broader context of the March 3 and March 23 meetings do not show the ARDC steamrolling Angelique S. Quite the opposite. The ARDC tabled the March 3 meeting due to Angelique S.'s health. Before that point, the ARDC recommended a short break to balance the need to continue the meeting (for MS's sake) with Angelique S.'s feelings of being overwhelmed. After Angelique S. read her statement at the March 23

meeting, Ms. Brooks explained how the ARDC sought to give her additional processing time by sending her the relevant materials in advance of the meeting.

From the ARDC meeting on February 6, 2023, where Angelique S. first expressed disagreement, the ARDC meticulously addressed each of Angelique S.'s concerns. *See* AR at 540 (acknowledging receipt of a pre-meeting email with parental concerns and stating that they will be addressed fully at the annual ARD), 583 (stating that "[Angelique S.'s] concerns will be addressed throughout this ARD meeting."), 583 ("Ms. Smith has a lot of questions regarding specially designed instruction and activities. A parent teacher conference was suggested so that all questions regarding instruction and activities can be addressed."), 584 ("Parent's written concerns . . . will be addressed throughout the meeting and documented in the part 2 of the meeting paperwork . . . The parent concerns will be included in this ARD document."), 586 ("[Ms. Hybner and Angelique S.] requests ESY services, because he is not currently on grade level . . . At this time, [MS] is recommended to participate in the ESY services provided by the district."). BISD held multiple parent-teacher conferences, provided data and benchmarking results to Angelique S., and even invited her to observe MS on campus several times, though she never took up those opportunities. *See* AR 719, at 30:58–31:45.

Angelique S. clearly did not agree with the ARDC's AFL placement. *See* AR 718, at 2:38:30–36 (Angelique S. stating that AFL "is for kids that drool on theyself. They don't have staff. They abuse the kids. I've seen it with my own eyes."[37]). Though the ARDC chose to continue the March 23 meeting over her objection, this is not enough to prove a lack of collaboration. *See White*, 343 F.3d at 380.

### d. Academic & Non-academic Benefits

To demonstrate positive benefits, an IEP must "produce progress, not regression or trivial educational advancement." *E.R.*, 909 F.3d at 765 (internal quotation marks and citations omitted). The progress must be "appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 403.

---

[37] To repeat, although Angelique S. was invited to visit the AFL classroom (and the campus more generally), she never accepted that offer. *See* AR 586; *see also* AR 719, at 30:58–31:45.

That standard is satisfied here. While MS struggled to access and benefit from the general education setting, he was making progress with his IEP goals in his focus subject areas and therapy and these goals were sufficiently ambitious for his circumstances. *See* AR at 521–23, 555–58, 1645–48.[38] And as explained above, MS was in good social standing with his typically developed peers. For these reasons, the fourth *Michael F.* factor is satisfied. *See A.A.*, 951 F.3d at 691.

The Court affirms the Hearing Officer's decision. Plaintiff has not shown that the Hearing Officer's decision should be overturned by a preponderance of the evidence. *See* 20 U.S.C. § 1415(i)(2)(C). BISD meticulously designed an IEP for MS and implemented it in full. AFL is the LRE for MS, BISD collaborated with Angelique S. throughout the planning process, and MS's IEP produced academic and non-academic benefits.

The Court sympathizes with Angelique S. and the stress and disappointment she has endured. There are few things in this world more significant than shaping the educational destiny of one's child. *Rodriguez*, 411 U.S. at 49 (internal quotation marks omitted) (quoting *Wright v. Council of the City of Emporia*, 407 U.S. 451, 469 (1972)) ("[D]irect control over decisions vitally affecting the education of one's children is a need that is strongly felt in our society."). But that interest does not exist in a vacuum; here, it sits alongside a proposed placement from the ARDC, a Hearing Officer's decision upholding that placement, and principles of deference—these are heavy weights on the scale. Although this is certainly not the outcome that Angelique S. would prefer for MS, BISD has "complied with the obligations imposed by Congress[.]" *See Rowley*, 458 U.S. at 207. "[This Court] can require no more." *Id.*

## IV.    CONCLUSION

For the foregoing reasons, it is **ORDERED** that Defendant Beaumont Independent School District's Motion for Summary Judgment [Dkt. 8] is hereby **GRANTED**.

---

[38] Since MS's IEP goals were so far below grade level, they did not factor into his actual grades. *See* AR 1580 (Ms. Bandy testifying that she determined MS's grades), 1629 (Ms. Malveaux testifying that MS's work on his unique IEP goals did not factor into his grades).

It is further **ORDERED** that Plaintiff M.S.'s Motion for Judgment on the Administrative Record [Dkt. 9] is hereby **DENIED**.

This is a **FINAL JUDGMENT**.

**SIGNED this 25th day of June, 2025.**

_Michael J. Truncale_
Michael J. Truncale
United States District Judge